**WASTE MANAGEMENT OF PENNSYLVANIA, INC.,**
Plaintiff,

v.

**CITY OF YORK, Defendants.**

No. 3:CV–92–836.

United States District Court,
M.D. Pennsylvania.

Nov. 21, 1995.

Bruce S. Katcher, Neil S. Witkes, Manko, Gold & Katcher, Bala Cynwyd, PA, Randi Sue Stock, Randi Stock Garnick, Manko,

Gold & Katcher, Bala Cynwyd, PA, for plaintiff.

Natalie M. Duval, Environmental Defense Section, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, Robin L. Juni, U.S. Dept. of Justice, Environ. & Natural Resources Division, Washington, DC, for petitioner.

Marc G. Tarlow, Kain, Brown & Roberts, York, PA, Robert R. Long, Jr., Assistant U.S. Attorney, Lewisburg, PA, Natalie M. Duval, Environmental Defense Section, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, Edward C. Roberts, Kain, Brown & Roberts, York, PA, Robin L. Juni, U.S. Dept. of Justice, Environ. & Natural Resources Division, Washington, DC, David M. Barasch, United States Attorney, Scranton, PA, for defendant.

## MEMORANDUM

VANASKIE, District Judge.

█ Pursuant to this Court's May 26, 1993 Amended Scheduling Order (Dkt. Entry 22), Plaintiff Waste Management of Pennsylvania, Inc. ("WMPA"), moves for a ruling that a settlement agreement between the City of York (the "City") and the United States Environmental Protection Agency ("EPA") does not immunize the City from liability on claims asserted against it by WMPA. Specifically, at issue is whether an administrative order by consent ("AOC") entered into between EPA and the City pursuant to Section 122(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9622(h), insulates the City from any liability to WMPA on its claims under CERCLA and state law for costs WMPA has incurred and will incur at the Old City of York Landfill Superfund Site (the "Site"). The City, joined by EPA as an intervenor, argues that WMPA's claims are barred by CERCLA's "contribution protection" provisions, which essentially provide

that a party that has resolved its liability to the United States "shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4). WMPA argues that Section 122(h), the statutory authority for the EPA settlement with the City, only authorizes administrative agency resolution of claims "for costs incurred *by the United States Government....*" 42 U.S.C. § 9622(h)(1) (emphasis added). Because WMPA is not seeking contribution for its potential liability to the United States for costs the Government may have incurred, but is instead pursuing claims for costs which WMPA itself has incurred, WMPA contends that the settlement with EPA does not immunize the City from liability.

The text of Section 122(h), the context of this legislative authorization of administrative settlements of response costs, and the policies underlying CERCLA support WMPA's contention. Succinctly stated, the matters addressed in a § 122(h) administrative settlement are necessarily limited to claims for costs incurred *by the United States Government.* A party who resolves its liability for such costs is entitled to protection against claims for contribution brought by others who contend that they have borne a disproportionate share of the costs incurred by the United States Government; but such a settling party is not entitled to protection against claims by nonsettling parties who, like WMPA, have independently incurred costs in cleaning up a Superfund site. Accordingly, WMPA's motion will be granted.[1]

## PROCEDURAL HISTORY

On June 22, 1992, WMPA commenced this action against the City for contribution relating to costs incurred and to be incurred in connection with the remediation of the Site, which is located in Springfield Township, York County, Pennsylvania. In its Complaint against the City (Dkt. Entry 1), WMPA seeks contribution from the City pursuant to CERCLA §§ 107(a) and 113(f), 42

---

1. A companion case, *Waste Management of Pennsylvania, Inc. v. United States Environmental Protection Agency and City of York,* 94–1609, in which WMPA is seeking to overturn the settle-
ment between the City and EPA, is also pending before this Court. The parties will be asked to comment on the status of that case in light of this Memorandum and Order.

U.S.C. §§ 9607(a) and 9613(f). WMPA also seeks to recover against the City pursuant to the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 P.S. § 6020.101 *et seq.*, the Pennsylvania Uniform Contribution Among Tortfeasors Act, 42 Pa.C.S.A. § 8321 *et seq.*, and state common law.

On August 3, 1992, the City filed its answer and affirmative defenses in which it asserted that "[t]his action is precluded by reason of a settlement that City of York reasonably believes will be entered between the York [sic] and EPA." (Dkt. Entry 6 at 6.) On April 12, 1993, EPA and the City entered into a *proposed* AOC regarding the Site.

On May 26, 1993, in an Amended Scheduling Order, the Court allowed the parties to brief the issue whether the proposed AOC, if approved and made final by EPA, would provide the City with immunity against WMPA's claims. (Dkt. Entry 22.) On June 14, 1993, WMPA filed a motion and supporting memorandum on the issues raised by the proposed AOC. (Dkt. Entry 23.) The City filed its response on July 16, 1993, (Dkt. Entry 27), to which WMPA filed a reply brief on July 30, 1993. (Dkt. Entry 28.) On August 12, 1993, the Court entered an Order staying all proceedings pending final EPA action on the proposed AOC.[2] (Dkt. Entry 31.)

On June 30, 1994, the proposed settlement was made final and on July 1, 1994, EPA gave written notice of its approval of the AOC. *See* Dkt. Entry 36. Because of the amount of time which had passed since briefing on WMPA's motion was completed, the Court entered an Order on July 27, 1994, setting a schedule for filing supplemental memoranda in connection with WMPA's motion to update the previously filed briefs. (Dkt. Entry 37.) Pursuant to the Court's Order, WMPA filed a supplemental memorandum on September 2, 1994. (Dkt. Entry

40.) The City filed its supplemental memorandum in opposition on September 30, 1994 (Dkt. Entry 41), to which WMPA filed a supplemental reply memorandum on October 17, 1994. (Dkt. Entry 42.) On December 23, 1994, EPA filed a motion for leave to participate as an amicus curiae (Dkt. Entry 44), which this Court granted in an Order dated May 30, 1995 (Dkt. Entry 68).

The City claims that its settlement with the EPA precludes each claim for relief asserted by WMPA. (Dkt. Entry 6, City's Answer and Affirmative Defenses.) WMPA argues that CERCLA section 122(h) does not authorize the EPA to settle liability for costs which *WMPA* has incurred or will incur in connection with the remediation at the Site. WMPA argues that section 122(h) only allows the City to settle liability for costs already incurred by EPA, not claims for costs incurred or to be incurred by a party other that the United States Government. Furthermore, WMPA argues that EPA's authority to grant contribution protection to settling parties extends only to those claims which are "matters addressed in the settlement." 42 U.S.C. §§ 9622(h)(4) and 9613(f)(2). Because WMPA's claims are not matters specifically addressed in the settlement, WMPA argues that the City is not shielded from WMPA's claims.

## FACTUAL HISTORY[3]

The City owned and operated the Site as a municipal waste landfill from 1961 to 1975. In approximately 1978, the City sold the Site to its current owner, Dr. Roger Boser. From 1961 until 1968, the City was the sole operator of the Site. During that time, wastes containing hazardous substances were disposed of at the Site. In 1968 the City contracted with private companies to operate the Site. Those companies included Rite–Way Services, Inc. ("Rite–Way"), which later merged into WMPA.[4]

---

2. By Order dated March 2, 1994, this case was transferred to the undersigned.

3. The facts are taken from WMPA's Memorandum in Support of its Motion Pursuant to the Amended Scheduling Order (Dkt. Entry 23), an October, 1987 AOC (Dkt. Entry 24, Exh. "F"), the April, 1993 proposed AOC (Dkt. Entry 24,

Exh. "C") and the June, 1994 final settlement (Dkt. Entry 36, Exh. 1).

4. The other companies were York Wrecking, Inc. and Building Maintenance Industries, whose successor, The Macke Company ("Macke"), recently filed a Chapter 11 Bankruptcy proceeding.

In 1982, pursuant to CERCLA, the Site was listed on the National Priorities List (the "NPL").[5] EPA notified the City, and Macke that they were potentially responsible parties ("PRPs") at the Site, and, in October, 1987, they entered into an AOC with EPA to perform the Remedial Investigation and Feasibility Study (the "RI/FS") in compliance with the National Contingency Plan and CERCLA, 42 U.S.C. §§ 9607 and 9622. See Dkt. Entry 24, Exh. "F."

On September 30, 1991, EPA issued a Record of Decision in which it selected a remedy at the Site with an estimated cost of $8 million. In October, 1991, EPA sent Special Notice Letters to nine PRPs, including the City, requesting that they finance the remedy selected and that they reimburse EPA for past response cost incurred at the Site.

On June 30, 1992, EPA issued a Unilateral Administrative Order ("UAO") to five parties (the "Respondents"). The Order required the Respondents, which did *not* include the City, to perform remedial action at the Site. Four of the parties, including WMPA, are complying or have complied with the Order and have incurred remediation costs. Three respondents, including WMPA, were former operators/transporters. The group as a whole operated or transported waste to the Site for less than half its operational life. One of the operator/transporters has commenced bankruptcy proceedings. *See* footnote 4, *supra*. The remaining two respondents are industrial generators who claim to be *de minimis* contributors to the waste at the Site.

As noted above, the City is not subject to the UAO. Instead, EPA and the City entered into settlement negotiations that culminated with the AOC. The AOC provides for a schedule of payments to be made by the City to the EPA for past and future response costs. In return, EPA agrees not to sue the City, deems the City's liability at the Site resolved, and grants the City full contribution protection pursuant to 42 U.S.C. §§ 9613(c)(2) and 9622(h)(4). EPA and the City claim that the agreement is predicated on the City's limited financial resources. The City in fact contends that it cannot pay more than it has agreed to pay and infers that to require it to pay more would cause it to be unable to provide essential services, such as police and fire protection. (Dkt. Entry 27 at 4–5.)

Under the Settlement, the City will pay EPA $615,000, or roughly seven percent (7%) of the costs of the remedy at the Site. This figure includes EPA's past response costs. The City argues that the settlement protects it against WMPA's private cost recovery action and insulates it from liability for the costs of remediating the Site.[6]

### DISCUSSION

Essentially, WMPA's claim against the City is for contribution "for costs incurred and to be incurred" in connection with the remediation of the Site.

> Contribution is a statutory or common law right available to those who have paid more than their equitable share of a common liability. Contribution is available under CERCLA because of the statute's imposition of joint and several liability, regardless of fault, on persons deemed responsible under CERCLA section 107 for the release or threatened release of hazardous substances from a facility.

*County Line Investment Co. v. Tinney*, 933 F.2d 1508, 1515 (10th Cir.1991). *See United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). In 1986, Congress amended CERCLA and added § 113(f), which expressly recognizes a

---

5. The NPL is a list of sites throughout the United States which are candidates for response action under CERCLA, and at which remediation is a national priority. 40 C.F.R. § 300, Appendix B.

6. The City has allegedly already incurred more than $1 million in response costs. The City reportedly paid $1.138 million toward the RI/FS,

an additional $586,000 for remediation, which included installing a public water line, and $127,000 in oversight costs and disputed invoices paid to the RI/FS contractor. (Dkt. Entry 27 at 3–4, and at Exhibit 1, January 13, 1992 letter from Edward Roberts, Esq. to Patricia Miller, Esq., EPA Office of Regional Counsel.)

right to contribution.[7] *County Line,* 933 F.2d at 1516. *See also United States v. Colorado & Eastern Railroad Co.,* 50 F.3d 1530, 1535 (10th Cir.1995); *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 92 (1st Cir.1990); *United States v. ASARCO, Inc.,* 814 F.Supp. 951, 956 (D.Colo.1993). However, the source of the right of contribution is § 107(a). *County Line,* 933 F.2d at 1516. CERCLA § 107 imposes strict liability on PRPs for costs associated with hazardous waste cleanup and site remediation and imposes joint and several liability on PRPs regardless of fault. *County Line,* 933 F.2d at 1515; *Colorado & Eastern,* 50 F.3d at 1535. Sections 107 and 113 work together; section 107 governs liability and section 113(f) creates the mechanism for apportioning liability among the responsible parties. *County Line,* 933 F.2d at 1517; *Transtech,* 798 F.Supp. at 1086.

The City argues that because it has settled with EPA, it is protected from any non-settling party's contribution claims. In making this assertion, the City relies on CERCLA sections 113(f)(2) and 122(h)(4), 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4). CERCLA section 113(f)(2) states:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9613(f)(2). CERCLA section 122(h)(4) states:

> A person who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement shall not dis-

charge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

42 U.S.C. § 9622(h)(4). The City asserts that the plain language of these sections shields it from the contribution claims asserted by WMPA.

Conversely, WMPA argues that the settlement does not provide the City with protection because the sections on which the City relies, 113(f)(2) and 122(h)(4), protect settling parties from contribution only for claims regarding "matters addressed in the settlement." WMPA contends that the only matters EPA is authorized to address in its administrative settlement entered into under § 122(h) are claims for cost "incurred by the United States Government," and, therefore, the settlement cannot shield the City for costs incurred or to be incurred by WMPA.

### A. CERCLA Section 122

EPA's authority to settle with the City is a creature of CERCLA. Therefore, EPA may not grant the City contribution protection beyond that which the statute provides. CERCLA Section 122, entitled "Settlements," authorizes EPA to enter into three types of settlement agreements with PRPs: (1) a clean-up settlement in which PRPs agree to do the clean-up work, 42 U.S.C. § 9622(d), which must be entered as a consent decree subject to mandatory judicial review, unless it is a *de minimis* administrative settlement, 42 U.S.C. § 9622(d)(1)(A); (2) a response cost settlement, under 42 U.S.C. § 9622(h)(1); and (3) a *de minimis* cash-out settlement, which is intended to cover a small percentage of the required response and/or remediation costs. 42 U.S.C. § 9622(g)(1).

Section 122(h)(1), the font of authority for the AOC at issue in this case, states:

7. In October, 1986, Congress amended CERCLA by passing the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, sec. 101 *et seq.,* 100 Stat. 1613 (1986). Prior to the passage of the amendments "it was unclear whether a private right of action existed for contribution to defendants from other potentially liable parties." *Transtech Industries Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1086 (D.N.J.1992), *appeal dismissed, mandamus denied,* 5 F.3d 51 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994), *quoting, Burlington Northern R. Co. v. Time Oil Co.,* 738 F.Supp. 1339, 1341 (W.D.Wash.1990).

The head of any department or agency with authority to undertake a response action under this chapter pursuant to the national contingency plan may consider, compromise and settle a claim under section 9607 of this title for costs incurred by the United States Government if the claim has not been referred to the Department of Justice for further action. In the case of any facility where the total response costs exceed $500,000 (excluding interest), any claim referred to in the preceding sentence may be compromised and settled only with the prior written approval of the Attorney General.

42 U.S.C. § 9622(h)(1).

CERCLA section 122(h)(1) is plainly limited to "costs incurred by the United States Government." Section 122(h)(4), 42 U.S.C. § 9622(h)(4), provides:

A person who has resolved its liability to the United States *under this subsection* shall not be liable for claims for contribution regarding matters addressed in the settlement. Such claims shall not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement. [Emphasis added.]

It is well settled that "the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Application of the plain terms of § 122(h) precludes contribution protection beyond costs incurred *by the Government* for matters addressed in the settlement. In short, because subsection (h) authorizes only settlements for "costs incurred by the United States Government," it follows that contribution protection under that subsection is limited to claims by a party which contends to have borne a disproportionate share of the liability for such costs. For example, if the Government incurred costs of $1 million, and settled with one party for $100,000 pursuant to Section 122(h)(1), the settling party could not be held liable for any part of the remaining $900,000 in liability that may be assumed by another party, even if the non-settling party's proportionate share of liability is less than 90 percent. But resolution of liability to the United States for its response costs cannot be extended to extinguish liability to private parties for costs they have incurred.

### B. The Statutory Context of Section 122(h)

As noted above, Section 122 authorizes three separate types of settlements. The first type, sometimes referred to as a "cleanup settlement," must be implemented through a district court consent decree. *See* 42 U.S.C. § 9622(d)(1)(A). Such consent decrees, which are intended to address the issues of *site* clean-up and liability, are reviewed for both reasonableness and fairness. *United States v. Vertac Chemical Corp.,* 756 F.Supp. 1215, 1218 (E.D.Ark.1991), *aff'd,* *United States v. Hercules, Inc.,* 961 F.2d 796 (8th Cir.1992); *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 84 (1st Cir. 1990); *City of New York v. Exxon Corp.,* 697 F.Supp. 677, 692 (S.D.N.Y.1988); *United States v. Conservation Chemical Co.,* 681 F.Supp. 1394, 1415 (W.D.Mo.1988). Consent decrees have been disapproved because of unfair apportionment of liability coupled with complete contribution protection. *See, e.g., United States v. Montrose Chemical Corp. of California,* 50 F.3d 741 (9th Cir.1995).

Judicial review of a "cleanup settlement" thus affords a PRP the opportunity to adjudicate the fairness of contribution protection in the context of a complete site remediation plan. Under these circumstances, once a consent decree has been approved it is appropriate to accord the settling parties contribution protection under 42 U.S.C. § 9613(f)(2) for "matters addressed" in the consent decree. *See Colorado Eastern,* 50 F.3d at 1536; *Cannons,* 899 F.2d at 92. A cost recovery settlement, however, lacks the procedural and substantive safeguards attending judicial approval of a consent decree. Moreover, a cost recovery settlement is necessarily limited in scope, addressing only the response costs incurred by the Government. Thus, *complete* contribution protection is neither warranted nor justified.

■ In addition to cleanup and cost recovery settlement authority, Section 122 confers authority to enter into expedited *final* settlements with PRPs whose responsibility is *de minimis*. 42 U.S.C. § 9622(g)(1). Section 122(g) states:

> Whenever practical ... the President shall ... reach a *final* settlement with a potentially responsible party in an administrative or civil action ... if such settlement involves only a minor portion of the response costs at the facility concerned. ...

42 U.S.C. § 9622(g)(1) (emphasis added). Section 122(g)(5) affords contribution protection "regarding matters addressed in the settlement." Since Section 122(g)(1) authorizes *"final* settlements," it necessarily follows that contribution protection under Section 122(g)(5) is greater than that authorized under Section 122(h). That is, because the matter addressed under a Section 122(g) agreement is a *final* settlement, contribution protection is necessarily complete. By way of contrast, the matter addressed under a Section 122(h) settlement is the cost incurred by the United States, which cannot encompass privately-incurred costs.

If, as the City and EPA contend, contribution protection may be extended beyond that which is authorized by the statutory provisions that form the basis for the settlement authority in the first instance, there would have been no need to establish such an elaborate framework for different types of settlements. Nor would there have been a need to express in both Sections 122(g) and 122(h) a contribution protection provision. The inclusion of a contribution protection provision in each subsection suggests that contribution protection was intended to be limited to that which Congress authorized to be included in the settlement agreement.

In this regard, neither the City nor EPA effectively address the point that Section 122(h) governs settlement authority for costs incurred *by the United States Government*.[8] Instead, the City and EPA argue that contribution protection against privately-incurred

costs has been sanctioned by the Courts. However, the cases on which the City and EPA rely either involved *de minimis* settlements, *e.g.*, *United States v. Alexander*, 771 F.Supp. 830, 832 (S.D.Tex.1991), *vacated*, 981 F.2d 250 (5th Cir.1993) (*de minimis* defendants who settled with the United States pursuant to a partial consent decree were shielded from contribution claims by § 9613(f)(2)); *Avnet, Inc. v. Allied–Signal, Inc.*, 825 F.Supp. 1132, 1138 (D.R.I.1992) (contribution claims against settling *de minimis* parties prohibited by §§ 113(f)(2) and 122(g)(5)); *Dravo Corp. v. Zuber*, 804 F.Supp. 1182 (D.Neb.1992), *aff'd*, 13 F.3d 1222 (8th Cir.1994) (plaintiff could not recover against parties that entered into *de minimis* settlement agreement with EPA); *United States v. Rohm & Haas Co.*, 721 F.Supp. 666 (D.N.J.1989), or concerned judicially-approved cleanup agreements in consent decrees. *Colorado Eastern*, 50 F.3d 1530 ("[A] PRP who has entered into a judicially approved settlement with the United States may not be held liable for contribution to another PRP if the contribution claim concerns matters addressed in the settlement."); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir.1994); *Cannons*, 899 F.2d at 92; *United States v. ASARCO, Inc.*, 814 F.Supp. 951, 956 (D.Colo.1993) (partial consent decree); *United States v. Pretty Products, Inc.*, 780 F.Supp. 1488 (S.D.Ohio 1991); *Comerica Bank–Detroit v. Allen Industries, Inc.*, 769 F.Supp. 1408 (E.D.Mich. 1991); *United States v. Vertac Chemical Corp.*, 756 F.Supp. 1215 (E.D.Ark.1991); *In re Acushnet River & New Bedford Harbor*, 712 F.Supp. 1019, 1029 (D.Mass.1989).

WMPA is not disputing that complete contribution protection can be afforded by way of a clean-up consent decree or by way of an administrative settlement with *de minimis* parties. The statute authorizes finality of liability to be addressed in Section 122(d) consent decrees and Section 122(g) *de minimis* settlements. But Section 122(h) does not authorize such finality of liability insofar as private party claims are concerned.

---

8. The parties address at great length the question of whether the phrase "costs incurred" signifies an intent to limit authority to settle claims for *past* costs or is time neutral. While that issue may be important in another context, the crucial issue here is the significance of the fact that authority is limited to settling claims for costs incurred *by the United States Government*.

## C. Policy Reasons Which Explain Why Section 122(h) Affords Only Limited Contribution Protection

Recognizing that Section 122(h) affords only limited contribution protection is consistent with the policies advanced by CERCLA. In *Transtech*, 798 F.Supp. 1079, the court addressed arguments similar to those advanced by EPA and the City in the case at bar. The *Transtech* defendants were PRPs who had settled with the United States for actual costs incurred by the United States. The consent decree covered actual costs of $4.9 million and absolved the defendants of liability for other remedial costs that the United States determined arose during the relevant time period. *Id.* at 1088. Furthermore, the United States covenanted not to take action against the settlors for future response actions and costs until reasonable efforts had been made to compel non-settling parties to implement response actions. *Id.* at 1088–1089.

The defendants argued that the agreement they had executed with the United States absolved them of all liability to other parties for the problems at the site. In rejecting this argument, the court discussed the outcome of the defendants' argument if it were to be taken it to its logical conclusion. Under such a scenario the plaintiffs could have avoided all liability for site remediation by agreeing to pay a portion of $4.9 million to the government to extinguish their responsibility to engage in clean-up activities which would have cost over $100 million. In language apropos here, the court explained that such a result was contrary to significant policies underlying CERCLA:

> Settlement payments of $4.9 million for clean-up costs exceeding $100 million would do little to further the goal of allocating responsibility among parties who were in fact responsible, and of allocating responsibility equitably and proportional to the amount of harm done by each party.... Moreover, ... to absolve defendants of responsibility for additional clean-up actions costing ten times more than

that amount, defies the goal of encouraging parties to unilaterally engage in cleanup operations. As one court has noted, "[i]f fair apportionment of the expense is not assured, it is unlikely that one party will undertake remedial action promptly when it could simply delay, awaiting a legal ruling on the contribution liability of other responsible parties."

*Id.*

Like *Transtech, Akzo Coatings of America v. American Renovating*, 842 F.Supp. 267 (E.D.Mich.1993), involved a determination of what matters were encompassed by a consent decree and included a policy analysis which is applicable to the case at bar. In *Akzo v. American Renovating*, as in this case, the settling parties asserted that *all* response costs were essentially the responsibility of the United States Government, and that any privately-incurred costs merely discharged a liability to the United States for costs it would have incurred. Thus, a settlement with the Government for response costs would also include those costs that could have been incurred by the Government, but were instead paid for by the non-settling party. In rejecting this argument, the court explained:

> The policy behind CERCLA is to make the responsible parties pay for the cleanup of hazardous waste sites. If defendants were permitted to settle with the government for part of the cleanup costs of a site, and then become immune from suit for contribution by private entities who paid for *other* cleanup costs, it would defeat the policy of CERCLA. Settling PRPs should not be made to pay twice for the same cleanups, but they also should not get a windfall because they settled.

*Id.* at 271.[9]

Clearly, Congress did not intend agreements between the Government and private parties to foreclose all other private party claims against the settling party. Such a result would be fundamentally unfair to non-settling parties and would discourage such

---

**9.** The court also explained that expenses incurred by a private party are not Government response costs. *Id.* at 272.

parties to engage in clean-up operations, contrary to one of CERCLA's primary goals.

Indeed to hold otherwise would implicate Fifth Amendment issues. In the case at bar the City and EPA are essentially contending that the AOC extinguishes rights not only under CERCLA but also under state statutory and common law. The right to sue a party for contribution or to recover costs incurred may be viewed as a property right. Depriving a party of that right raises a question of whether there has been a taking of property without just compensation.

Congressional concern for this consequence is reflected in 42 U.S.C. § 9657, which provides:

> If an administrative settlement under Section 9622 of this title has the effect of limiting any person's right to obtain contribution from any party to such settlement, and if the effect of such limitation would constitute a taking without just compensation in violation of the Fifth Amendment of the Constitution of the United States, such person shall not be entitled, under other laws of the United States, to recover compensation from the United States for such taking, *but in any such case, such limitation on the right to obtain contribution shall be treated as having no force and effect.* [Emphasis added.]

This constitutional concern is greatest in the context presented here, where there are substantial costs incurred privately beyond those incurred by the Government. According complete contribution protection where the non-settling party has incurred substantial costs deprives that party of the right to obtain either an equitable apportionment of liability or to seek an apportionment of responsibility on the basis of divisibility of harm. For example, if the Government incurred $1 million in response costs, and that was the total amount incurred to clean up the

site, and the Government settled with one party for $100,000 and sued another party for the remaining $900,000, the non-settling party, if held liable jointly and severally, would be responsible for the full $900,000, even though it may be only ten percent liable on an equitable apportionment basis. This may be rationalized as a consequence of joint and several liability and the *pro tanto* contribution limitation expressed in CERCLA. But the non-settling party would have had the right to argue divisibility of harm so that if its share of harm could have been limited to ten percent, or $100,000, EPA would bear the remaining $800,000 in costs. In that scenario, EPA is bearing the risk of apportionment of liability under divisibility of harm criteria. *See United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 269 (3rd Cir. 1992).[10]

In the situation before this Court, the party who is forced to incur costs on its own has no opportunity to limit its liability on the basis of divisibility of harm or equitable apportionment of liability principles. In this context, a property interest may have been taken without just compensation. This is a possible pernicious consequence of the administrative settlement scheme advanced by the City and EPA. On the other hand, an interpretation that preserves contribution rights for privately-incurred costs does not carry with it this problem because the non-settling parties' contribution rights have not been forfeited.

### CONCLUSION

Section 122(h) only allows EPA to settle the City's claims for those clean-up costs incurred by the Government. This conclusion is supported by the plain language of the statute and the policies underlying CERCLA. I, therefore, find that the proposed settlement between EPA and the City may not provide the City with protection from

---

10. As recognized in *United States v. Pesses,* No. 90–654, 1994 WL 741277, 1994 U.S.Dist.LEXIS 18684 (W.D.Pa. November 7, 1994):

> Without a determination on the divisibility issue ..., it cannot be assumed that the remaining private party defendants will be legally obligated to shoulder the entire costs of all further actions at the site in the end. Thus, without an affirmative basis from which to

> conclude that any permanent remedial action ultimately selected will be funded by those who legally bear the responsibility for such actions, the complete release of the [settling defendants] is premature and inconsistent with the Congressional intent reflected in § 122....

*Id.* 1994 WL 741277 at * 14, 1994 U.S.Dist.LEXIS 18684 at * 46–47.

**1044**

WMPA's contribution claims. An appropriate Order is attached.

### *ORDER*

**AND NOW, THIS** 21st **DAY OF NOVEMBER, 1995,** in accordance with the attached memorandum, **IT IS HEREBY ORDERED THAT:**

1) Waste Management of Pennsylvania's ("WMPA") motion pursuant to the amended scheduling order (Dkt. Entry 23) requesting that the proposed settlement between the City of York (the "City") and the United States Environmental Protection Agency ("EPA") does not provide the City with contribution protection from the claims asserted by WMPA is **GRANTED.**

2) A scheduling conference will be held on Friday, December 8, 1995, at 12:30 p.m.